

**NUMBER 13-12-00369-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE: J.J.F., A CHILD

**On appeal from the County Court at Law No. 2
of Hidalgo County, Texas.**

## MEMORANDUM OPINION

**Before Justices Benavides, Perkes and Longoria
Memorandum Opinion by Justice Longoria**

Jose Manuel Figueroa has filed this appeal raising thirteen issues challenging the following: (1) the trial court's order in a suit to modify the parent child relationship increasing the amount of monthly child support Mr. Figueroa is required to pay to Erica Edith Alonzo from $10,000 to $28,000; (2) the trial court's order on Ms. Alonzo's motion to enforce temporary orders increasing Mr. Figueroa's monthly child support obligation from $10,000 to $40,000; and (3) the trial court's judgment in favor of Ms. Alonzo and against Mr. Figueroa for child support arrearages and interest in the amount of $35,000.

For the reasons set forth below, we reverse the orders and judgment and remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND

On October 26, 2006, Mr. Figueroa and Ms. Alonzo were divorced.[1] Pursuant to an agreed divorce decree, Mr. Figueroa was required to pay Ms. Alonzo monthly child support in the amount of $10,000 for the couple's one minor child, J.J.F. The parties agree that on July 22, 2010, Mr. Figueroa paid Ms. Alonzo $260,000; however, they disagree about the nature of the payment. Mr. Figueroa maintains that it was a "lump sum payment [given to Ms. Alonzo] as an advance of two years child support to be effective through March 2012."[2]

Ms. Alonzo contends that "there was no executed agreement between the parties and private agreements between the parties [to modify an obligor's child support obligations] are against public policy and unenforceable."[3] Ms. Alonzo contends further that "[i]t is apparent that the $260,000 was not a prepayment otherwise . . . [Mr. Figueroa] would not have continued to pay his child support in August 2010 and September 2010." According to Ms. Alonzo, the truth is that Mr. Figueroa "stopped paying his child support obligation in October 2010 when he learned of . . . [Ms.

---

[1] However, in her two appellate briefs, Ms. Alonzo maintains that the parties "were divorced in 2006 but continued to have a relationship as husband and wife until July 2010." At oral argument, counsel for Ms. Alonzo stated "that they were still living together as husband and wife, though not legally married." At oral argument, we asked counsel for Mr. Figueroa to respond to this assertion, and he stated that he did not understand Ms. Alonzo to be saying that the parties were still married. The divorce decree provided in relevant part as follows: "Termination of Orders on Remarriage of Parties The provisions of this decree relating to current child support terminate on the remarriage of [Ms. Alonzo] to . . . [Mr. Figueroa] . . . ."

[2] We note that $260,000 at the rate of $10,000 per month would equal twenty-six months of child support payments.

[3] Mr. Figueroa does not dispute that "[t]here was no written agreement between [the parties] . . . regarding the reason for the July lump sum payment."

2

Alonzo's] marriage to . . . [another man] and it was his opinion . . . [Ms. Alonzo] had another man to provide for her."  Mr. Figueroa does not dispute that he stopped making monthly child support payments in October of 2010, but he argues that he made the required child support payments in advance on July 22, 2010 by paying Ms. Alonzo $260,000.

## A. Ms. Alonzo's Pleadings

On November 15, 2010, Ms. Alonzo filed two pleadings:  (1) a "motion for enforcement of child support order and order to appear," alleging child support arrearages owed by Mr. Figueroa in the amount of $20,000, representing unpaid support owed in the amount of $10,000 due on October 1, 2010 and $10,000 due on November 1, 2010; and (2) a petition to modify the parent child relationship, which also requested temporary orders.[4]

## B. Orders by the Trial Court

Also on November 15, 2010, the trial court signed an order to appear, directing Mr. Figueroa to appear before the court and to respond to Ms. Alonzo's "motion for enforcement of child support order and order to appear" at a hearing to be held on January 10, 2011 at 1:00 p.m.  In the order to appear, the court stated that "[t]he purpose of this hearing is to determine whether the relief requested in . . . [Ms. Alonzo's motion for enforcement of child support order] should be granted."  The parties dispute

---

[4] In the petition, Ms. Alonzo requested that the court modify certain provisions of the divorce decree regarding (1) possession, (2) access, and (3) support.  In relevant part, the petition alleged that "[t]he circumstances of the child or a person affected by the order have materially and substantially changed since the date of the rendition of the order to be modified . . . ."  The petition further alleged that "[t]he support payments previously ordered are not in substantial compliance with the guidelines in Chapter 154 of the Texas Family Code, and the requested increase would be in the best interest of the child."  According to the petition, "the monthly amount of support ordered differs by 20 percent from the amount that would be awarded in accordance with the guidelines in Chapter 154 of the Texas Family Code."  In addition, Ms. Alonzo requested that the trial court enter temporary orders for the safety and welfare of the child, including but not limited to an order to pay child support while the case is pending.

3

whether Mr. Figueroa was served with the order to appear at this time. The clerk's record includes an officer's return, file marked November 19, 2010, stating that on November 15, 2010, Mr. Figueroa was served with true copies of the citation and Ms. Alonzo's petition to modify the parent child relationship. According to the officer's return, service was accomplished by certified mail sent to 1900 Brandi Lane, Edinburg, Texas.[5] The clerk's record does not indicate that, at that time, Mr. Figueroa was served with notice of the hearing set for January 10, 2011 on Ms. Alonzo's "motion for enforcement of child support order and order to appear."[6]

Also on November 15, 2010, the trial court set Ms. Alonzo's request for temporary orders for a hearing to be held at 9:30 a.m. on November 23, 2010. The clerk's record includes a second officer's return, also file marked on November 19, 2010, stating that on November 15, 2010, Mr. Figueroa was served with the notice to show cause via certified mail sent to the same Brandi Lane address. The notice to show cause states that Mr. Figueroa is ordered to appear before the trial court at 9:30 a.m. on November 23, 2010.

---

[5] According to Mr. Figueroa, "[t]here is no evidence in the clerk's file to indicate that any certified mail citation was ever received by anyone." Although the officer's return was filed on November 19, 2010, Mr. Figueroa states that "[t]here is no green card and no officer's return alleging completed service of process." The divorce decree lists the Brandi Lane address as the current residential and mailing address for Ms. Alonzo, but it does not provide any address for Mr. Figueroa, as required by law. *See* TEX. FAM. CODE ANN. § 105.006(a)(2) (West 2008) ("A final order, other than in a proceeding under Chapter 161 or 162, must contain . . . each party's current residence address, mailing address, home telephone number, name of employer, address of employment, and work telephone number . . . ."). Therefore, Ms. Alonzo could not rely on the Brandi Lane address as Mr. Figueroa's address of record. *See id.* § 105.006(f) ("[I]n any subsequent child support enforcement action, the court may, on a showing that diligent effort has been made to determine the location of a party, consider due process requirements for notice and service of process to be met with respect to that party on delivery of written notice to the most recent residential or employer address filed by that party with the court and the state case registry.").

[6] In his appellate brief, Mr. Figueroa does not state whether he appeared before the trial court at the hearing set for 1:00 p.m. on January 10, 2011. He also does not state whether the trial court held the hearing as scheduled, and the record does not indicate whether the trial court held the scheduled hearing.

On November 22, 2010, the trial court entered an "order on motion for alternative service." The order states "that service on Mr. Jose Manuel Figueroa [shall] be effected by serving Louis Amador, Jr. at 1900 Brandi Lane, Edinburg, Texas."[7] In addition to the two officer's returns described above, the clerk's record includes several additional documents evidencing service on Louis Amador, Jr.[8]

On December 1, 2010, the trial court signed an order re-setting the hearing on Ms. Alonzo's request for temporary orders for December 9, 2010. On December 9, 2010, the trial court signed another order re-setting the hearing on Ms. Alonzo's request for temporary orders—this time for December 16, 2010.[9]

## C. Hearing on Temporary Orders

On December 16, 2010, the trial court held a hearing on Ms. Alonzo's request for temporary orders. At the hearing, Ms. Alonzo's counsel stated the following:

> We're set for Temporary Orders today. We did the service the alternative service route. And then to be extra precautious - - he was in town yesterday. We served him personally, as well. . . . He wouldn't accept it, but he was served, nonetheless. So if I could go forward on Temporary Orders? And I don't believe he's here.

---

[7] Ms. Alonzo's motion for alternative service states that Louis Amador, Jr. is an employee of Mr. Figueroa.

[8] A third officer's return, file marked December 10, 2010, states that on December 10, 2010, a process server delivered to Louis Amador, Jr., in person, true copies of the citation and Ms. Alonzo's petition to modify the parent child relationship. In addition, a fourth officer's return, also file marked December 10, 2010, states that on December 10, 2010, a process server delivered to Louis Amador, Jr., in person, a true and correct copy of the notice to show cause at a hearing to be held on January 10, 2011 at 1:00 p.m. A fifth officer's return, dated December 10, 2010, states that a process server delivered to Louis Amador, Jr., in person, a true and correct copy of Ms. Alonzo's motion for enforcement of child support order and order to appear.

[9] A sixth officer's return, file marked December 16, 2010, states that on December 15, 2010, a process server delivered to Mr. Figueroa, in person, true copies of the citation and Ms. Alonzo's petition to modify the parent child relationship. Finally, a seventh officer's return, also file marked December 16, 2010, states that on December 15, 2010, a process server delivered to Mr. Figueroa, in person, a true copy of the notice to show cause at a hearing to be held on January 10, 2011 at 1:00 p.m. On appeal, Mr. Figueroa does not dispute the December 15, 2010 service.

Thereafter, the following exchange occurred:

| | |
|---|---|
| [Ms. Alonzo's Counsel]: | So for current support, we'd ask for an increase to forty thousand, because on top of that [$10,000 per month], he was supposed to be paying ten thousand for the maintenance of the home, the tuition, clothing and medicals. But the property taxes, on a yearly basis, are a hundred thousand. So we need the current child support with the trust amount, which is twenty, doubled to forty thousand, because since her remarriage, he hasn't been paying anything. |
| The Court: | Well, what we're going to do is I'm going to order it, and at the time that we have a final [hearing] on it, we can address that at that time. |

### D. Mr. Figueroa's Pleadings

On January 4, 2011, Mr. Figueroa filed a plea in abatement, answer to Ms. Alonzo's petition to modify the parent child relationship, and counter motion for enforcement. Although the trial court had set Ms. Alonzo's "motion for enforcement of child support order and order to appear" for hearing on January 10, 2011, the record does not indicate whether the trial court conducted the hearing as scheduled. On January 18, 2011, Ms. Alonzo filed a response to Mr. Figueroa's plea in abatement and answer to counter motion for enforcement.

### E. Proceedings on Temporary Orders

On February 9, 2011, the trial court entered "temporary orders in [the] suit to modify parent-child relationship." In the orders, the trial court stated that Mr. Figueroa, "although duly and properly notified, did not appear and wholly made default." The court ordered Mr. Figueroa to pay monthly child support in the amount of $40,000 beginning on January 1, 2011.

6

On September 7, 2011, Ms. Alonzo filed a "Motion for Enforcement of Temporary Orders in Suit to Modify Parent-Child Relationship and Order to Appear." In the motion, Ms. Alonzo alleged that Mr. Figueroa's "total arrearage from December 2010 until the time of filing is $400,000.00."

On October 4, 2011, Mr. Figueroa filed a response to Ms. Alonzo's motion for enforcement of temporary orders. Mr. Figueroa argued that he was not given notice of the hearing on the temporary orders held on December 16, 2010 and that the temporary orders entered on February 9, 2011 were therefore void. On October 25, 2011, Mr. Figueroa filed a supplemental response to Ms. Alonzo's motion to enforce temporary orders. In his supplemental response, Mr. Figueroa "object[ed] to the motion . . . because he was never personally served with the motion . . . or notice of any hearing on said motion as required by Texas Family Code Section 157.062." *See* TEX. FAM. CODE ANN. § 157.062 (West 2008) ("notice of hearing"). On November 11, 2011, Mr. Figueroa filed his response to Ms. Alonzo's motion for enforcement of child support order and his first amended answer to the petition to modify the parent child relationship and counter motion for modification. In his response, Mr. Figueroa denied Ms. Alonzo's allegation that he had failed to make two monthly child support payments in the amount of $10,000 on October 1, 2010 and November 1, 2010, respectively.

## F. Final Hearing

On December 19, 2011, the trial court conducted a hearing on Ms. Alonzo's (1) motion for enforcement of the temporary orders, (2) motion for enforcement of the child support order, and (3) petition to modify the parent child relationship. Mr. Figueroa objected to the temporary orders and the efforts to enforce those orders.

The trial court heard testimony from Ms. Alonzo, Mr. Figueroa, and Mr. Figueroa's employee, Antonio Navarro. Ms. Alonzo testified in relevant part about the needs of the child and the amount of support claimed to be necessary, which she asserted was $40,000 per month. In addition, Ms. Alonzo also testified that she did not receive monthly child support payments from Mr. Figueroa in October, November, or December of 2010. Ms. Alonzo was not asked about the payment she received from Mr. Figueroa on July 22, 2010 in the amount of $260,000. However, her testimony that she did not receive monthly child support payments in October, November, or December of 2010 could be construed to mean that she did not consider the $260,000 payment to be an advance of future child support, as Mr. Figueroa maintained. At oral argument before this Court, counsel for Ms. Alonzo stated that it was Ms. Alonzo's position that the $260,000 payment "was a gift"—that "they were still living together as husband and wife, though not legally married, and that he was trying to help her get her business going."

Mr. Figueroa testified that he did not make the required monthly child support payments in October, November, and December of 2010 because on July 22, 2010 he made an advance payment in the amount of $260,000 that covered those months. Mr. Figueroa testified in relevant part as follows:

> It's not that I didn't pay. I paid - - I gave her the money in advance. If you notice, we have the receipt of the exact amount of two years in advance because she asked me to - - to help her with a - - with a problem that she told me she had with her business. So I told her I was willing to help give her her two years in advance of that money that we - - that we agreed on on the divorce. I mean, here is the fact that I don't know how to deal with money and legal papers. But if you put together 24 times 13, [it] is the exact [amount of] money that I gave her [for] two years in advance. So I -

- I didn't stop giving her the money. I just gave her the money in advance.[10]

In his testimony, Mr. Figueroa explained that under the divorce decree, he was required to make monthly payments to Ms. Alonzo in the amount of $13,000, consisting of child support in the amount of $10,000 and spousal support in the amount of $3,000. He also testified that he continued making spousal support payments even after his obligation to make such payments expired under the divorce decree. According to his testimony, the $260,000 payment was an advance of voluntary spousal support and court-ordered child support for two years.

However, on cross examination, counsel for Ms. Alonzo took issue with Mr. Figueroa's assertion that the $260,000 payment was an advance payment of child support. As set forth below, Mr. Figueroa testified that before he made the $260,000 payment, he knew Ms. Alonzo was planning to invest the $260,000 in a business venture from which she was expecting to receive a return sufficient to meet the needs of J.J.F. Mr. Figueroa also testified that after he made the $260,000 payment, Ms. Alonzo informed him that she did not realize the return on the investment that she had expected. According to Mr. Figueroa, he then voluntarily paid Ms. Alonzo an additional $13,000 per month in August and September of 2010. In the following testimony, Mr. Figueroa explains that he stopped making payments in October of 2010 because he had paid two years in advance and because Ms. Alonzo had married another man:

Q. You still continued to pay, quote, child support check [sic] to her [in] August of 2010, correct?

A. (In English) No, no.

Q. No?

---

[10] We note that $13,000 multiplied by 24 is $312,000.

A. (In English) She asked - - she - - she convinced me because the plan was that after she correct her - - I mean correct - -

(Through the interpreter) - - that after she would solve her financial problems in her business, her business was going to generate [income] for her in order to counter for my obligation to pay the $13,000 monthly.

So during that first month she realized, and she informed me, that it was going to be impossible for her to come up with that amount of money - -

(In English) - - and there again, I sent her money, just the way I sent her money ten days ago or something or whatever - - whenever. . . .

Q. My question is: If you gave her this - - this advance for two years beginning July 2010 - -

A. (In English) Why did I give? I'm [a] great man.

Q. Okay. Then you did it again for September's payment, and you paid her $13,000 [on] August 27th. And the description says - - and let me finish - - September 2010 spousal and child support, $13,000. If your understanding was that your child support obligation for two years was going to be fulfilled - -

A. (In English) Come on.

Q. - - by paying $260,000 - -

A. (In English) So you're telling me - -

Q. - - let me finish the question.

. . .

A. (In English) I'm sorry.

. . .

Q. If it's going to be done by paying $260,000 in July, why did you pay August and September, and then when she gets married in October, you decide I'm not going to pay a dollar?

10

A.   (In English)  When you - - I'm going to inform you and I'll ask you. When you have a relationship, no matter what, beautiful or horrible, or whatever, but a relationship for 11 years or so, and you believe someone, it's hard to learn and accept that you're being - - I'm not going to say cheated - - you're being put aside of a relationship.

(Through the interpreter)  There are things that are done because of love, and there are things that are done out of stupidity.  The things that I've done out of love, I did them and I don't question myself about them.  But the things that I do, underlining the word out of a stupidity, those ones I do question myself, and I try to avoid them.

So when I found - - so when I found out that the woman to whom I gave everything she needed besides all the things that she didn't need, according to me, was putting me to [sic] aside in her life as a man, I understood or I deduced that there was another man who was a man like a man that I am or someone who was more a man than what I was.

And under the - - under the impression that I have that as a father I had complied with everything at all times, I thought and I decided that another man should take my place completely.

(In English)  That's it.

. . .

Q.   I understand the emotions of it all.  I sincerely do.

A.   (In English)  All right.  Maybe not.

Q.   Maybe not to that extent, you're right.  But as a result of her getting married, do you feel or do you think that relieves you of your obligation to pay support for . . . [J.J.F.]?

A.   (In English)  As I told you before in the conversation that I tried to have with you right now, I do feel that I've been - -

(Through the interpreter)   - - that I have to fill [sic] with my responsibilities.  The records show that I have complied with them.  So I think that even your question is out of place.

Q.   Show me a document, or tell me from your memory, where you made a payment of [sic] October 2010 for at least the child support amount.

11

A.     (In English)  I don't have a record with me.

Q.     Show me - -

A.     (In English)  If you want I can - - we - - we can call the person that is - - you need that record?  We - - we have - -

. . .

We'll show you.

Q.     [In] November 2010, did you make a child support payment?

A.     (In English)  I did not.

Q.     Were you still angry about . . . [the other man] at that point to where you said, "Let another man fulfill my obligations.  I'm not going to do it"?

A.     (In English)  Tell - - I don't - - you're asking me if I was mad to [sic] . . . [the other man]?

Q.     You told me that when you found out Erica - -

A.     (In English)  This is the first time I mentioned . . . [him].

Q.     He would be the other man, though, correct?

A.     (In English)  He would be the man.

Q.     Okay.  And when you said that another man was more of a man to her and that he chose her, then let the new man take your place, would that place include - -

A.     (In English)  No.

Q.     - - him providing for your child?

A.     (In English)  Of course not.

Q.     Okay.  So then why didn't you make - -

A.     (In English)  And now I'm asking you, now that you mention you believe with - - with this money that you're asking me, if I was

12

asked $13,000, now that I'm asking - - I've been asked for 40,000, does that include his babies, or just mine?

. . .

Q.   Okay.   And we go back to the question about there not being a payment by you [in] October or November 2010 for child support in the amount of $10,000.

A.   (In English)  As - - I - - I didn't have to pay anything until two years. I mean two years was - - were covered.

Q.   But we've already - -

A.   (In English)   No, no, I gave that money to her because she convinced - - convinced me that her business again was not giving the money that it was supposed to give.

Q.   Mr. Figueroa, you've given me two answers to the question, and - -

A.   (In English)   And I can give you more if you keep on trying to confuse me.

Q.   I just want the truth, like you honor the truth and you - -

A.   (In English)  Yes, I do.

Q.   - - said before this Court - -

A.   (In English)  Yeah.

Q.   - - you tell the truth.  Tell me which is the truth between your two answers.  So far I've heard two answers to the question.  I've asked you the question:  Why did you not make a payment [in] October and November of 2010?  Your first answer was - -

A.   (In English)  Not payment.

Q.   Mr. Figueroa, hold on.  Your first answer was something to the extent of she now has a new man in her life - -

A.   (In English)  I stopped giving her money - -

Q.   That's - -

A.   - - her.

13

Q.     - - that's the first answer.  The second answer was:  Well, I didn't have to pay her because I gave her money in July.  Which is your answer?  The first or the second?  And I just want the truth.

A.     (In English)  Well, I - -

       (Through the interpreter)  Well I - - the truth - - the truth - - regarding the first one - - well, actually, regarding the second one that you mentioned, yes, I stopped making the payments because I thought it was a stupid thing to continue maintaining a woman as my woman when she was not my woman anymore.

Q.     Okay.  Do you believe that because she got married [to another man], . . . [J.J.F.] - - well, I say remarried - - . . . [J.J.F.] no longer goes to school?

A.     (Through the interpreter)  Of course not.  The only thing that I was certain of and I was aware of was that my daughter had a mother who was sufficiently, honestly and responsible to know that she had two years' worth of advanced payments for my daughter.  And based on that, I could give myself the right to not give more money that was not necessary.

Q.     So any money that you have given her since July of 2010 is only necessary money?

A.     Necessary to a man, whenever a man loves a woman, then he provides that woman with pleasure, luxury, and eccentric things.

Q.     And the $260,000 you said was for business problems that Erica was having, correct?

A.     (In English)  Correct.  She told me so.

Q.     And if she told you what that money was for and she was using it for business, how do you think she would still have that money for child support?

A.     (In English)  She convinced me that if you put it into - - injected that money to the business, the business - - the business was going to be in bonanza.  She even told me how much money she was going to make monthly.  I said okay, then no problem.  You provide yourself with the money that I was supposed to give you, okay, the money that I'm giving you in advance.  That's it.

14

Q.    But you knew that wasn't enough the very next month, and you knew that she had used the $260,000 for what she told you, because in August you still gave her money, correct?

A.    (In English)  I gave her money, yes.

Q.    And [in] September you gave her money, correct?

A.    (In English)  I gave her money, right.

Q.    But you just didn't give her money in October.  But you didn't give her money because you thought, oh, well, she has the 260?

. . .

A.    (In English)  I was telling you that - - where was I?  Where was I?

Q.    You were on the amount about why you didn't pay her in October, and you said because a new man was there?

A.    (In English)  Well, if you want to be - - you want me to be more specific about it or what answer are you - - what are you asking me?

Q.    You didn't pay October 2010 your child support?

A.    (In English)  Well, if she - - if she had told me that the next month it wasn't the money on her business it was going to come up, I figured that after three months and - - and with the help of a great lawyer, and a great man in her life, she wouldn't need me anymore - - for two years at least.

Q.    But you knew that money was for a business purpose?

A.    (In English)  But she told me that it was going to be enough for her to - - to recoup and then come back with - - with the needs.

Q.    But it wasn't a month later, right?  And it wasn't - -

A.    (In English)  Yeah.

Q.    - - two months later.  How is it - -

A.    (In English)  But, she told me so and she told me many lies.  I don't know.

15

Q.     Was it enough one month after you gave her the money?

A.     (In English)  She told me so - -

Q.     She told you it was?

A.     - - I don't know.

Q.     Okay.  That was enough?  The payment you sent her or that the business investment?

A.     (In English)  She convinced me that was not - - that was not enough - -

Q.     Okay.  For August - -

A.     - - so I - -

Q.     - - for August?

A.     (In English)  In every time until - - until last week, until three - - three weeks ago, every time she wants to convince me that she needs money, she gets money from me.

Q.     And how did she convince you not to pay [in] October of 2010 or [in] November 2010?

A.     (In English)  She didn't ask me anymore.

Q.     She didn't ask you?

A.     (In English)  She didn't ask me anymore.

Q.     December of - -

A.     (In English)  She - - as a matter of fact, she kept quiet for many - - for I don't know how many months.  I guess she was on a honeymoon and - - and in a good state of economic situation I guess, maybe, she didn't need me.  So just as long as she didn't need me, she didn't call me. . . .

Q.     If that were the case, then why would [you] . . . allow for a payment to be made in September - -

A.     (In English)  Because I told - -

16

Q.      - - August and September of - -

A.      (In English)  They don't allow - - I told them to send her money, just as I told the - - the guy that sent the money two weeks ago or ten days ago, because she convinced me that she needs money to pay you - - do whatever.  She told me to.  I don't know.  I don't know.  I don't know.  I never asked for receipts or what the - - whatever the money is need or used for, I don't know.  But the thing is, when she convinced me that she needs money, I give her money.

Q.      Okay.   And just like you told them to pay it [in] August and September 2010, you also told them don't pay in October, November and December 2010, correct?

A.      (In English)  I don't remember saying don't pay it because - -

Q.      Whatever the words may be, you instructed them not to do it?

A.      (In English)  I - - is - - instruct - - I convinced myself, first of all - - it was not nice.  It was not necessary.  It was stupid to - - to send her more money under the situation that we were aware of - - that we were.

. . .

Q.      But you recall telling them to send it in August - -

A.      (In English)  Yes.

Q.      - - and September - -

A.      Yes.

Q.      Good memory.  Then back - -

A.      (In English)  Of course.  Of course.  When - - when I said yes, they - - they know what I mean.  Yes.  When I don't say anything, they must applaud.

In further support of his position, Mr. Figueroa offered the testimony of Navarro, his employee.  Navarro testified that he was involved in making Mr. Figueroa's support payments to Ms. Alonzo, including the payment of $260,000 in July of 2010.  According to Navarro, it was his understanding that the $260,000 was an advance of "20 months

17

worth of payments to" Ms. Alonzo for August of 2010 through March of 2012 at the rate of $13,000 per month, consisting of $10,000 per month for child support and $3,000 per month in spousal support. Navarro testified that he furnished a draft written acknowledgment to Ms. Alonzo, which she refused to sign after she received the $260,000 payment. Navarro also testified that on August 17, 2010, Mr. Figueroa paid Ms. Alonzo $21,000, of which $13,000 was for child support and spousal support. Navarro also testified that "there was another . . . [payment] that was done towards the end of August" in the amount of $18,000, of which $13,000 was for child support and spousal support.

After hearing the evidence and arguments from both sides, the court requested that the parties submit proposed orders and took the matters under advisement.

## G. The Trial Court's Rulings

On March 6, 2012, the trial court entered an order in the suit to modify the parent child relationship. In its order, the trial court stated "that the material allegations in the petition to modify are true and that the requested modification is in the best interests of the child." The order stated that Mr. Figueroa is "obligated to pay and shall pay to . . . [Ms. Alonzo] child support in the amount of $28,000 per month, with the first payment being due and payable on January 1, 2012." The trial court also awarded Ms. Alonzo's counsel a judgment in the amount of $35,000 for attorney's fees, expenses, and costs incurred.

On March 6, 2012, the trial court also signed an order granting Ms. Alonzo's motion for enforcement of temporary orders. In the order, the trial court stated that it found that by a previous order entered on February 9, 2011, Mr. Figueroa was ordered

18

to pay child support in the amount of $40,000 beginning January 1, 2011. The court found that since January 1, 2011, Mr. Figueroa "should have paid $525,000.00 in child support payments." The court found that since January 1, 2011, Mr. Figueroa "has made payments totaling $150,970.00." Based on the foregoing, the court ordered Mr. Figueroa to "pay past due child support pursuant to the Court's Temporary Orders in the amount of $374,030.00 by January 15, 2012."

In addition, on March 6, 2012, the trial court signed a judgment for child support arrearages. In the judgment, the trial court found that Mr. Figueroa "is in arrears in the amount of $30,000.00 for the period of October 1, 2010 through December 1, 2010 and that interest has accrued in the amount of $5,000." The trial court ordered Mr. Figueroa to pay the amount of $35,000 by January 15, 2012.

Finally, on March 22, 2012, Mr. Figueroa requested that the trial court enter findings of fact and conclusions of law regarding its order granting Ms. Alonzo's motion for enforcement of temporary orders and its judgment for child support arrearages. *See* TEX. R. CIV. P. 296 ("In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law."). On April 4, 2012, Mr. Figueroa filed a motion for new trial with respect to the orders and judgment. *See* TEX. R. CIV. P. 320 ("New trials may be granted and judgment set aside for good cause, on motion or on the court's own motion on such terms as the court shall direct."). On April 26, 2012, Mr. Figueroa filed a notice of past due findings of fact and conclusions of law. *See* TEX. R. CIV. P. 297 ("If the court fails to file timely findings of fact and conclusions of law, the party making the request shall, within thirty days after filing the original request, file with the clerk and serve on all other

19

parties . . . a 'Notice of Past Due Findings of Fact and Conclusions of Law' . . . ."). The trial court did not enter findings of fact or conclusions of law.

Thereafter, Mr. Figueroa filed this appeal raising thirteen issues challenging the following: (1) the trial court's modification order increasing the amount of monthly child support Mr. Figueroa is required to pay to Ms. Alonzo from $10,000 to $28,000; (2) the trial court's order enforcing the temporary orders that increased Mr. Figueroa's monthly child support obligation from $10,000 to $40,000; and (3) the trial court's judgment for child support arrearages and interest in the amount of $35,000.[11]

## II. MODIFICATION ORDER

In his first six issues, Mr. Figueroa challenges the trial court's modification order as follows:

1. The trial court committed error and abused its discretion when it ordered child support in an amount in excess of the presumptive amount without making findings required by Texas Family Code § 154.130.

2. The trial court committed error and abused its discretion in ordering an excessive amount of child support.

---

[11] On December 12, 2012, Mr. Figueroa filed a motion for emergency stay pending appeal. By order dated December 18, 2012, this Court directed the trial court to stay enforcement of its "Order in Suit to Modify Parent-Child Relationship" pending further order of this Court or resolution of this appeal. On January 3, 2013, Ms. Alonzo filed her First Amended Motion for Enforcement and Order to Appear with the trial court. In her motion, Ms. Alonzo complained about Mr. Figueroa's failure to pay: (1) child support in the amount of $28,000 per month, beginning January 1, 2012, as ordered by the trial court on March 6, 2012; (2) past-due child support in the amount of $374,030.00 by January 15, 2012, as ordered by the trial court on March 6, 2012; and (3) the judgment in the amount of $35,000.00 by January 15, 2012, as ordered in the court's judgment entered on March 6, 2012. Ms. Alonzo requested that the trial court hold Mr. Figueroa in contempt, jailed for up to 180 days, and fined up to $500 for each of the foregoing alleged violations. Ms. Alonzo's motion was set for hearing on February 11, 2013. On February 6, 2013, Mr. Figueroa filed an emergency "Motion for Notice to Trial Court of Stay Order and Second Motion for Stay Pending Appeal with this Court," requesting that this Court immediately stay the contempt proceedings initiated by Ms. Alonzo pending resolution of this appeal. On February 7, 2013, we issued an order directing the trial court to stay enforcement of its (1) order on motion to enforce the temporary orders, (2) judgment for child support arrearages, and (3) order in the suit to modify the parent child relationship. We noted that the stay would remain in effect until final resolution of this appeal or until further order of this Court.

20

3. The trial court committed error and abused its discretion in ordering child support in excess of the proven needs of the child.

4. The trial court committed error and abused its discretion in awarding attorney's fees because there was no evidence to support the award of $35,000 in attorney's fees.

5. The evidence is legally insufficient to justify an award of attorney's fees of $35,000.00.

6. The evidence is factually insufficient to justify an award of attorney's fees of $35,000.00.

## A. Modification of the Child Support Order

In his first three issues, Mr. Figueroa challenges the amount of child support ordered by the trial court.

## 1. Law Applicable to the Modification of a Child Support Order

"The trial court may modify a previous child support order if the circumstances of the child or a person affected by the order have materially and substantially changed since the date of the order's rendition." *In the Interest of C.C.J.*, 244 S.W.3d 911, 917 (Tex. App.—Dallas 2008, no pet.). "In determining whether there has been a material and substantial change in circumstances, it is well-settled that the trial court must examine and compare the circumstances of the parents and any minor children at the time of the initial order with the circumstances existing at the time modification is sought." *Id.* "The record must contain both historical and current evidence of the relevant person's financial circumstances." *Id.* "Without both sets of data, the court has nothing to compare and cannot determine whether a material and substantial change has occurred." *Id.* at 918. "The movant has the burden to show the requisite material and substantial change in circumstances since the entry of the previous order." *Id.*

21

## 2. Law Applicable to the Calculation of the Amount of Child Support

"The [Texas] Family Code guides the calculation of child support and bases that calculation on a percentage of monthly resources." *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996) (citing TEX. FAM. CODE ANN. § 154.125). "The trial court has the discretion to deviate from the guidelines and consider other factors." *Id.* (citing TEX. FAM. CODE ANN. § 154.123). "Section 154.130 requires a trial court ordering child support that varies from the amount that would result if the guidelines were applied to make certain findings." *In re S.B.S.*, 282 S.W.3d 711, 717 (Tex. App.—Amarillo 2009, pet. denied) (citing TEX. FAM. CODE ANN. § 154.130(a)(3)). As the Amarillo Court of Appeals has observed:

> Among the findings that the trial court must make are the net monthly resources of the obligor and obligee, the percentage applied by the court to the obligor's net monthly resources that yields the child support obligation set by the court, the amount of support that would result if the guidelines were followed, and the specific reasons why the amount ordered by the court varies from the amount called for by application of the guidelines.

*Id.* (citing TEX. FAM. CODE ANN. § 154.130(b)). "These findings are mandatory and the failure to make them when required constitutes reversible error." *Id.*

## 3. Standard of Review for Modification Order

"A trial court's order pertaining to child support will not be reversed on appeal unless the complaining party can show a clear abuse of discretion." *Melton v. Toomey*, 350 S.W.3d 235, 238 (Tex. App.—San Antonio 2011, no pet.) (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable." *Worford*, 801 S.W.2d at 109.

"The Texas Family Code allows a court to modify a child support order if the movant shows that the circumstances of the child or a parent have materially and substantially changed since the date of the order's rendition." *Melton*, 350 S.W.3d at 238. "Moreover, a court's consideration of the child support guidelines in a modification proceeding is discretionary, not mandatory." *Id.*

**4. Discussion of the Modification of the Amount of Child Support**

In his first issue, Mr. Figueroa argues that the trial court committed error and abused its discretion when it ordered child support in an amount in excess of the presumptive amount without making findings required by Section 154.130 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 154.130 (West Supp. 2012). Ms. Alonzo does not dispute that the presumptive amount of monthly child support in this case is $1,500 and that the trial court ordered child support in an amount that exceeded the presumptive amount. *See id.* § 154.125 (West Supp. 2012). In relevant part, section 154.130 provides as follows:

(a) [I]n rendering an order of child support, the court shall make the findings required by Subsection (b) if . . .

> (3) the amount of child support ordered by the court varies from the amount computed by applying the percentage guidelines under Section 154.125 or 154.129, as applicable.

(b) If findings are required by this section, the court shall state whether the application of the guidelines would be unjust or inappropriate and shall state the following in the child support order:

> "(1) the net resources of the obligor per month are $_____;
>
> "(2) the net resources of the obligee per month are $_____;
>
> "(3) the percentage applied to the obligor's net resources for child support is _____%; and

> "(4) if applicable, the specific reasons that the amount of child support per month ordered by the court varies from the amount computed by applying the percentage guidelines under Section 154.125 or 154.129, as applicable."

*Id.* § 154.130(a)(3), (b).

The trial court did not make these findings in its modification order. However, Ms. Alonzo argues that the trial court was not required to make any findings because "in a modification proceeding, . . . the court's adherence to the guidelines is only discretionary." We agree with Ms. Alonzo that the trial court has discretion to deviate from the guidelines. *See id.* § 156.402(b) (West 2008) ("If the amount of support contained in the [existing] order does not substantially conform with the guidelines for single and multiple families under Chapter 154, the court may modify the order to substantially conform with the guidelines if the modification is in the best interest of the child. A court may consider other relevant evidence in addition to the factors listed in the guidelines.").

Although "the trial court is not required to follow the guidelines [in a modification suit], it must make certain fact findings if the amount of child support it orders varies from the amount computed by applying the percentage guidelines under Texas Family Code sections 154.125 or 154.129, as applicable." *In re A.M.P.*, 368 S.W.3d 842, 846–47 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Accordingly, we conclude that the trial court abused its discretion in increasing Mr. Figueroa's monthly child support obligation to $28,000 because it failed to make the findings required by section 154.130. *See id.* at 847 ("Because the trial court did not make any such findings in the case under review, the trial court abused its discretion in modifying [the] monthly child-support obligation if the modified amount varied from the amount computed by applying

24

the percentage guidelines under Texas Family Code section 154.125 or 154.129, as applicable."). Mr. Figueroa's first issue is sustained.[12]

## B. Award of Attorney's Fees to Ms. Alonzo's Counsel

In his fourth through sixth issues, Mr. Figueroa challenges the award of attorney's fees to Ms. Alonzo's counsel. "An attorney's fees award in a suit affecting the parent-child relationship is discretionary with the trial court." *Lenz v. Lenz*, 79 S.W.3d 10, 21 (Tex. 2002) (citing TEX. FAM. CODE ANN. § 106.002). "In light of our decision today [reversing the modification order], the trial court should have an opportunity to reconsider the attorney's fees award." *Id.* (citing *Bruni v. Bruni*, 924 S.W.2d 366, 368–69 (Tex. 1996)). Accordingly, we "remand the attorney's fees issue to the trial court for further proceedings consistent with this opinion." *Id.* We dismiss Mr. Figueroa's fourth through sixth issues as moot. *See* TEX. R. APP. P. 47.1.

### III. ENFORCEMENT ORDER

In his seventh and eighth issues, Mr. Figueroa challenges the trial court's enforcement order as follows:

7. The trial court committed reversible error and abused its discretion in enforcing an order that was fatally defective for the following reasons:

A. The Temporary Orders were void because they were ordered by the trial court at a time when the trial court did not have jurisdiction over Appellant because he had not been served with citation in the Modification action.

B. The Temporary Orders on which the Motion for Enforcement was based were entered without notice to Movant [sic] in violation of his rights to due process and due course of law guaranteed by the Fifth and Fourteenth Amendments to the Unites States Constitution and Article I, Section 10 of the Texas Constitution and Appellant was prejudiced by the lack of notice.

---

[12] In light of our holding, we do not reach the merits of Mr. Figueroa's second and third issues challenging the amount of the modified monthly child support payments. *See* TEX. R. APP. P. 47.1.

C. The Temporary Orders on which the Motion for Enforcement was based were entered without notice to Movant [sic] in violation of the requisites of the Texas Rules of Civil Procedure and the Texas Family Code.

D. There was no factual or legal basis presented to the Court at the hearing on the Temporary Orders for a child support award of $40,000 per month. That is an amount more than 26 times the maximum under the child support guidelines set forth in Family Code § 154.125. The Family Code provides in § 154.126(b) "in no event may the obligor be required to pay more child support than the greater of the presumptive amount (in this case $1,500.00 dollars) or the amount equal to the proven needs of the child." Petitioner failed to offer proof of the needs of the child and did not prove that the needs of the child were $40,000.00 per month.

E. Petitioner gave no notice of intent to seek an award of support based on an allegation that the actual needs of the child were in excess of the presumptive amount. The pleading on file at the time of the temporary orders in this case alleged that "[t]he support payments previously ordered are not in substantial compliance with the guidelines in chapter 154 of the Texas Family Code . . . ." The pleading also alleges that "[i]t has been three years since the order to be modified was rendered, and the monthly amount of support differs by 20 percent from the amount that would be awarded in accordance with the guidelines in chapter 154 of the Texas Family Code." (Petition to Modify Parent-Child Relationship, p.3).

F. There are no findings in the Temporary Orders justifying an award of child support in excess of the presumptive amount as required under Texas Family Code Section 154.130.

8. There are no findings of fact and conclusions of law.

## A. Enforcement of the Temporary Orders

In his seventh issue, Mr. Figueroa contends that the trial court erred in enforcing the temporary orders based on points A–F, which we have quoted above in the preceding section.

26

### 1. Law Applicable to the Temporary Orders

"[T]he court may make a temporary order . . . for the safety and welfare of the child, including an order . . . for the temporary support of the child." TEX. FAM. CODE ANN. § 105.001(a)(2) (West 2008). "Temporary orders . . . are not subject to interlocutory appeal." *Id.* § 105.001(e). A temporary "order is subject to and enforceable under Chapter 157." *Id.* § 105.001(f).

### 2. Discussion of the Order Enforcing the Temporary Orders

In point A, Mr. Figueroa contends that at the time the temporary orders were entered the trial court did not have personal jurisdiction over him because he had not been served with citation in the modification suit in which Ms. Alonzo requested the temporary orders. As set forth above, on January 4, 2011, Mr. Figueroa filed a plea in abatement, answer to the petition to modify the parent child relationship, and counter motion for enforcement seeking affirmative relief from the trial court. The trial court entered the temporary orders on February 9, 2011.

"Unlike subject matter jurisdiction, the lack of personal jurisdiction may be waived." *Arnold v. Price*, 365 S.W.3d 455, 458 (Tex. App.—Fort Worth 2011, no pet.). In this case, Mr. Figueroa entered a general appearance prior to the entry of the temporary orders. *See id.* at 458–59 ("A party enters a general appearance and waives a special appearance when it (1) invokes the judgment of the court on any question other than the court's jurisdiction, (2) recognizes by its acts that an action is properly pending, or (3) seeks affirmative action from the court.") (quotations omitted). Furthermore, under Rule 121 of the Texas Rules of Civil Procedure, "An answer shall constitute an appearance of the defendant so as to dispense with the necessity for the

27

issuance or service of citation upon him." Tᴇx. R. Cɪv. P. 121; *see also Livanos v. Livanos*, 333 S.W.3d 868, 874 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("When a defendant has not answered, the trial court acquires jurisdiction over the defendant solely on proof of proper service."). Accordingly, the trial court had personal jurisdiction over Mr. Figueroa at the time it entered the temporary orders. We overrule point A.

In points B and C, Mr. Figueroa contends that the temporary orders were entered without proper notice of the hearing held on December 16, 2010. *See* Tᴇx. Fᴀᴍ. Cᴏᴅᴇ Aɴɴ. § 105.001(b) (West 2008) ("Except as provided by Subsection (h), an order may not be rendered under Subsection . . . [(a)(2) for temporary support of the child] except after notice and a hearing."). At the hearing on the motion to enforce the temporary orders, counsel for Mr. Figueroa argued in relevant part as follows:

> All right, the next point that was brought up was the Motion for Enforcement of Temporary Orders. And, Your Honor, we filed a response to the Motion for Enforcement of Temporary Orders. And in order to have a proper order bind someone, you have to give them due process notice. And what the Texas Rules of Civil Procedure say is that due process notice means citation.
>
> And what we have in this case is a hearing on December 16, 2011 [sic] where this Court was asked to enter temporary orders for $40,000 in temporary child support pending final order. There was no evidence admitted at the hearing to support $40,000 [in] support. So there's no evidence to support that finding.
>
> The Court was notified that Mr. Figueroa had been served. What had happened was on December 10th, 2010, a citation and a notice to appear were delivered to a man named Louis Amador based on a motion for substituted service that did not meet the requirements of the Rules of Civil Procedure. And the citation to Mr. Louis Amador stated that there's a Motion for Enforcement of Child Support Order and Oder to Appear. You need to file an answer in 20 days. That's not even the matter that was before the Court on the temporary orders, which was modification. So we don't have a citation yet on the modification.

28

The order to appear, an order to appear saying you're commanded to appear in County Court At Law #2 on January 10th, 2011. That's the citation, and it's verified by Rosie Cooper with her return of service. And that's all she says she gave him.

Well, that's not notice of the hearing on December 16th, and there was no order setting a hearing on December 16 in existence at that time anyway.

So then on December 15th, 2010, there was a citation directed to Mr. Figueroa. Again, Motion for Enforcement of Child Support and Order to Appear. It doesn't refer to a Motion to Modify Child Support. And it says you need to serve an answer within 20 days. And that was personally served on him on December 15th, 2010, together with an order to appear.

The order to appear says show up in the County Court At Law #2 on January 10th, 2011, not on December 16th. And that's the citation, and it's verified by Claudia Cantu as having been served on Mr. Figueroa on December 15th at 3:20 p.m. That's it.

So, when this Court was presented with the request for temporary orders, there had not been service of citation on Mr. Figueroa of the Motion for Modification of Child Support. That had not happened. Plus, there had been no notice as reflected in the citation, and that's the way it works. When you take a judgment or an order against somebody who's not there and who hasn't entered an appearance in the case yet, you've got to have that perfect citation and service on him. And it doesn't reflect that he was served by the records on file with the Court that the Court took judicial notice of.

So that order, with all due respect, is not enforceable. It's not properly enforceable against Mr. Figueroa because of the circumstances under which it was entered and the fact that there was no evidence to support it.

We agree with Mr. Figueroa's contentions before the trial court and on appeal regarding the lack of notice of the hearing held on December 16, 2010. Under Section 105.001 of the Texas Family Code, Mr. Figueroa was entitled to notice and an adversary hearing before the entry of a temporary order modifying the amount of his monthly child support obligation. *See id.* § 105.001(b) (West 2008) ("Except as provided by Subsection (h), an order may not be rendered under Subsection . . . [(a)(2) for temporary support of the child] except after notice and a hearing."). Furthermore,

29

the record supports Mr. Figueroa's contention that he did not receive notice of the hearing held on December 16, 2010. Ms. Alonzo does not contend otherwise.

Instead, Ms. Alonzo argues that Mr. Figueroa should have filed a petition for writ of mandamus when the trial court entered the temporary orders on February 9, 2011. *See In re Herring*, 221 S.W.3d 729, 730 (Tex. App.—San Antonio 2007, orig. proceeding) ("Because temporary orders in suits affecting the parent-child relationship are not appealable, a petition for a writ of mandamus is an appropriate means to challenge them."). Although we do not disagree in principle that a petition for writ of mandamus is an appropriate means to challenge a temporary order in a suit affecting the parent child relationship, *see id.*, we believe that Mr. Figueroa is entitled to challenge the order enforcing the temporary orders because it is a final order subject to appeal. *See* TEX. FAM. CODE ANN. § 109.002(b) (West Supp. 2012) ("An appeal may be taken by any party to a suit from a final order rendered under this title."). Accordingly, we reject Ms. Alonzo's argument to the contrary and sustain Mr. Figueroa's seventh issue.

**B.  Findings of Fact and Conclusions of Law on the Order Enforcing the Temporary Orders**

In his eighth issue, Mr. Figueroa contends that the trial court erred in failing to enter, upon his timely request, findings of fact and conclusions of law on its order enforcing the temporary orders. *See* TEX. R. CIV. P. 296. "Findings of fact and conclusions of law are required upon request in any case tried in the district or county court without a jury." *Gene Duke Builders, Inc. v. Abilene Hous. Auth.*, 138 S.W.3d 907, 908 (Tex. 2004) (per curiam). "A trial court's failure to make findings is not harmful error if the record before the appellate court affirmatively shows that the complaining party

30

suffered no injury." *Tenery*, 932 S.W.2d at 30. "Under Texas Rule of Civil Procedure 296, harm to the complaining party is presumed unless the contrary appears on the face of the record when the party makes a proper and timely request for findings and the trial court fails to comply." *Id.*

In this case, the record does not affirmatively show that Mr. Figueroa suffered no injury as a result of the trial court's failure to make the required findings and conclusions. *See id.* Furthermore, since we have already sustained Mr. Figueroa's seventh issue challenging the trial court's order enforcing the temporary orders, we conclude that reversal, and not abatement, is the appropriate disposition. Accordingly, Mr. Figueroa's eighth issue is sustained.

## IV. JUDGMENT FOR CHILD SUPPORT ARREARAGES AND INTEREST

In his ninth through thirteenth issues, Mr. Figueroa challenges the trial court's judgment for child support arrearages and interest thereon as follows:

9. The trial court erred in granting the Judgment for Arrearages because the evidence showed that Appellant had made the payments required of him.

10. The evidence was legally insufficient to establish the arrearages in the amount of $30,000.00.

11. The evidence was factually insufficient to establish the arrearages in the amount of $30,000.00.

12. The trial court erred in awarding interest of $5,000.00 because

   A. There was no evidence (legally insufficient evidence) as to an amount of interest[; and]

   B. The interest awarded was in excess of any allowable judgment rate.

13. There are no findings of fact and conclusions of law.

31

## A. Standard of Review for the Enforcement Order

"An appellate court reviews an order enforcing a previous child support order for abuse of discretion." *In the Interest of T.J.L.*, 97 S.W.3d 257, 265 (Tex. App.—Houston [14th Dist.] 2002, no pet.). "Under the abuse of discretion standard, sufficiency of the evidence is not an independent ground of error but rather is a relevant factor in assessing whether the trial court abused its discretion." *Chenault v. Banks*, 296 S.W.3d 186, 189 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "In making this determination, we view the evidence in the light most favorable to the trial court's order, indulging every legal presumption in its favor." *In re B.S.H.*, 308 S.W.3d 76, 78 (Tex. App.—Fort Worth 2009, no pet.). "An abuse of discretion does not occur as long as there is some probative and substantive evidence to support the trial court's decision." *Id.*

## B. Law Applicable to Child Support Arrearages

"A parent's duty of support, although often characterized monetarily and used with terms like 'arrearages,' is not a debt owed to the other parent." *Office of Attorney Gen. of Tex. v. Scholer*, 403 S.W.3d 859, 866 (Tex. 2013). "The [Texas] Family Code characterizes child support as a duty rather than a debt." *Id.* (citing TEX. FAM. CODE ANN. §§ 154.006, .013, .128). The Texas Supreme Court has "held that the obligation which the law imposes . . . on parents to support their children is not considered a 'debt' . . . but a legal duty arising out of the status of the parties." *Id.* (quoting *Ex parte Hall*, 854 S.W.2d 656, 658 (Tex. 1993)). "The child's welfare underlies child support enforcement suits, and providing monetary support is part of a parent's contribution to that welfare." *Id.* "As a result, the parents' actions, either collectively or alone, cannot affect the support duty, except as provided by statute." *Id.* "For example, the [Texas]

Family Code requires parents to obtain court approval, conditioned on the child's best interest, before they can enforceably agree to modify child support." *Id.*

"In calculating child support arrearages, the trial court's discretion is very limited." *Chenault*, 296 S.W.3d at 189. Section 157.262 of the Texas Family Code states that a trial court "may not reduce or modify the amount of child support arrearages" except as specifically provided in the Texas Family Code. TEX. FAM. CODE ANN. § 157.262 (West 2008). "The trial court acts as a mere scrivener in mechanically tallying up the amount of arrearage." *Chenault*, 296 S.W.3d at 189. "Although the trial court can award certain offsets and credits, the trial court has no discretion to forgive or decrease a past child support obligation." *Id.* "Thus, in a proceeding to confirm child support arrearages, the trial court's child support calculations must be based on the payment evidence presented, not the trial court's assessment of what is fair or reasonable." *Id.* at 190. "As with child support arrearages, the trial court also has no discretion to modify, forgive, or make equitable adjustments in awarding interest on child support arrearages." *Id.*

## C. Discussion of Mr. Figueroa's Payment of $260,000

In his ninth through eleventh issues, Mr. Figueroa contends that the trial court erred in finding unpaid child support in the amount of $30,000 because there is uncontroverted evidence that he made a lump sum payment to Ms. Alonzo on July 22, 2010 in the amount of $260,000. In his thirteenth issue, Mr. Figueroa contends that the trial court erred in failing to make findings of fact and conclusions of law upon his timely request. *See* TEX. R. CIV. P. 296.

33

Although the parties agree that Mr. Figueroa paid Ms. Alonzo $260,000 on July 22, 2010, they dispute the nature of the payment and whether Mr. Figueroa is entitled to a credit for child support. The parties agree that Mr. Figueroa continued to pay Ms. Alonzo $10,000 for child support in August and September of 2010. Mr. Figueroa testified that he stopped making payments in October of 2010 after he learned that Ms. Alonzo had married another man. At that time, he determined that it was a "stupid thing" to continue providing support to Ms. Alonzo. He also testified that the $260,000 payment was for "business problems" Ms. Alonzo was experiencing. Mr. Figueroa testified that he intended for Ms. Alonzo to provide for J.J.F.'s needs with the return that she expected to receive from the $260,000 investment in her business. There was no evidence that Mr. Figueroa intended for Ms. Alonzo to use the $260,000 to meet J.J.F.'s current or future needs directly. In fact, as we previously noted, the uncontroverted evidence was that Mr. Figueroa paid Ms. Alonzo her regular support payments in August and September of 2010 and stopped making payments in October of 2010 when he learned that Ms. Alonzo had married another man.

We recognize that Mr. Figueroa's intent with respect to the $260,000 payment is an issue of fact for the trial court to decide. *See Iliff v. Iliff*, 339 S.W.3d 74, 76 (Tex. 2011) (identifying "obligor's intent" as an issue of fact in the context of underemployment). Yet, in this case, the rationale for the trial court's ruling is uncertain because the trial court failed to enter findings of fact and conclusions of law upon Mr. Figueroa's timely request as required by the rules of civil procedure. *See Las Vegas Pecan & Cattle Co. v. Zavala County*, 682 S.W.2d 254, 256 (Tex. 1984) ("Failure of the trial court to prepare and file findings of fact or conclusions of law under Rule 296 does

34

not require a reversal of the trial court's judgment if the record before the appellate court affirmatively shows the complaining party suffered no injury."). Although there is evidence to support one potential basis for the trial court's judgment (i.e., that the $260,000 was for a purpose other than child support), Mr. Figueroa should not have to guess the reason for the ruling; he is entitled to challenge the actual basis for the ruling. *Id.* Because the basis for the trial court's ruling is unclear, we conclude that Mr. Figueroa has "suffered . . . [some] harm as a result of the failure of the trial judge to file findings of fact" in connection with this particular ruling. *Id.* Accordingly, we sustain Mr. Figueroa's ninth issue in part. Furthermore, because we also conclude (for the reasons set forth below) that the trial court erred in awarding interest on the arrearages, we conclude that reversal, and not abatement, is the proper remedy. In light of our disposition, we dismiss Mr. Figueroa's tenth and eleventh issues as moot for purposes of this appeal. *See* TEX. R. APP. P. 47.1; *Chenault*, 296 S.W.3d at 189 ("Under the abuse of discretion standard, sufficiency of the evidence is not an independent ground of error . . . .").

## D. Discussion of Prejudgment Interest on Child Support Arrearages

In his twelfth issue, Mr. Figueroa maintains that the trial court abused its discretion by awarding prejudgment interest in the amount of $5,000. In its judgment, the trial court found that Mr. Figueroa "is in arrears in the amount of $30,000.00 for the period October 1, 2010 through December 1, 2010 and that interest has accrued in the amount of $5,000.00." Assuming for the sake of argument that the amount of Mr. Figueroa's child support arrearages was correctly determined to be $30,000, we

conclude that the trial court erred in calculating the amount of interest owed on the arrearages.

In relevant part, the Texas Family Code provides as follows:

Interest accrues on the portion of delinquent child support that is greater than the amount of the monthly periodic support obligation at the rate of six percent simple interest per year from the date the support is delinquent until the date the support is paid or the arrearages are confirmed and reduced to money judgment.

TEX. FAM. CODE ANN. § 157.265(a) (West 2008). The family code also provides that "[a] child support payment is delinquent for the purpose of accrual of interest if the payment is not received before the 31st day after the payment date stated in the order by . . . the obligee." *Id.* § 157.266(a)(2) (West 2008).

Pursuant to the divorce decree, Mr. Figueroa's child support payments were due on the "1st day of each month." Therefore, Mr. Figueroa's child support payment for October of 2010 was due on October 1, 2010, and if it was not paid, as alleged by Ms. Alonzo and found by the trial court, it became delinquent on November 1, 2010. Similarly, Mr. Figueroa's child support payment for November of 2010 was due on November 1, 2010, and if it was not paid, as alleged by Ms. Alonzo and found by the trial court, it became delinquent on December 2, 2010. Finally, Mr. Figueroa's child support payment for December of 2010 was due on December 1, 2010, and if it was not paid, as alleged by Ms. Alonzo and found by the trial court, it became delinquent on January 1, 2011. The trial court confirmed and reduced Mr. Figueroa's arrearages to a money judgment on March 6, 2012.

Based on the foregoing, and assuming without deciding that Mr. Figueroa did not make the required child support payments, an issue which we do not decide due to the

36

trial court's failure to enter findings of fact and conclusions of law, Mr. Figueroa's October child support payment would have been delinquent for a period of 491 days before the entry of the money judgment on March 6, 2012. At the rate of 6%, simple interest would have accrued in the amount of $807.12. Again, assuming without deciding that Mr. Figueroa's November payment was not made, it would have been delinquent for a period of 460 days before the entry of the money judgment. Again, at the rate of 6%, simple interest would have accrued in the amount of $754.52. And finally, assuming without deciding that Mr. Figueroa's December payment was not paid, it would have been delinquent for a period of 430 days, and at the rate of 6%, the delinquent payment would have accrued interest in the amount of $706.85. Based on these calculations, and assuming without deciding that Mr. Figueroa did not make the required child support payments, the sum total of prejudgment interest owed by Mr. Figueroa on these arrearages would have been $2,268.49.

In prior cases involving miscalculation of prejudgment interest, this Court has held that the trial court misapplied the law to the facts of the case, reversed the judgment of the trial court in part, and remanded the case to the trial court to calculate the proper amount of prejudgment interest due and owing on the arrearages and to enter a judgment consistent with this Court's opinion. *See*, *e.g.*, *Castle v. Harris*, 960 S.W.2d 140, 144 (Tex. App.—Corpus Christi 1997, no pet.) (citing TEX. R. APP. P. 44.1(b)). We note that the Texas Supreme Court has also remanded for calculation of the proper amount of prejudgment interest. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 533 (Tex. 1998) ("We accordingly modify the judgment of the court of appeals and remand the cause to the trial court for the

37

calculation of the amount of prejudgment interest and for rendition of judgment in accordance with this opinion"). Accordingly, we sustain Mr. Figueroa's twelfth issue, reverse the judgment for child support arrearages and interest, and remand the case to the trial court to calculate the proper amount of interest due and owing on the child support arrearages, if any, found to be owed by Mr. Figueroa.

**E. Discussion of the Trial Court's Failure to Enter Findings and Conclusions**

In his thirteenth issue, Mr. Figueroa contends that the trial court erred in failing to enter findings of fact and conclusions of law as required by the Texas Rules of Civil Procedure. *See* TEX. R. CIV. P. 296. "Findings of fact and conclusions of law are required upon request in any case tried in the district or county court without a jury." *Gene Duke Builders, Inc.*, 138 S.W.3d at 908. "A trial court's failure to make findings is not harmful error if the record before the appellate court affirmatively shows that the complaining party suffered no injury." *Tenery*, 932 S.W.2d at 30. "Under Texas Rule of Civil Procedure 296, harm to the complaining party is presumed unless the contrary appears on the face of the record when the party makes a proper and timely request for findings and the trial court fails to comply." *Id.*

As we previously discussed in connection with Mr. Figueroa's ninth issue, the trial court erred in failing to make the requested findings and conclusions with respect to its judgment for child support arrearages and interest. *See* TEX. R. CIV. P. 296. Furthermore, the record does not affirmatively show that Mr. Figueroa suffered no harm as a result of the trial court's failure to make the required findings and conclusions *See Tenery*, 932 S.W.2d at 30. Moreover, since we have already determined that the trial court's judgment for child support arrearages and interest must be reversed and the

38

case remanded, we conclude that it would be inappropriate to abate the case for the trial court to enter the required findings and conclusions, as Mr. Figueroa has requested. Subject to the foregoing qualification, we sustain Mr. Figueroa's thirteenth issue.

## V. CONCLUSION

For the reasons set forth above, we reverse the trial court's modification order, enforcement order, and judgment for child support arrearages and interest. We remand the case to the trial court for further proceedings consistent with this opinion.


NORA L. LONGORIA
Justice

Delivered and filed the
6th day of February, 2014.